UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                             :

A.M., by her parent, Y.N.,              :
                                             :

                     Plaintiff,     :           12 Civ. 5573 (JMF)
                                             :

           -v-                     :         OPINION AND ORDER
                                           :

THE NEW YORK CITY DEPARTMENT OF   :
EDUCATION,
                                           :

                   Defendant.    :
                                           :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/9/2013

JESSE M. FURMAN, United States District Judge:

        Plaintiff A.M., a student diagnosed with intellectual[1] and learning disabilities, brings this action by her parent, Y.N., pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, challenging the education program offered by the New York City Department of Education ("DOE"). A.M. asks this Court to vacate the decision and order of a New York State Review Officer ("SRO") and award tuition reimbursement as a result of the DOE's alleged denial of a free appropriate public education ("FAPE"). Defendant has filed a cross-motion for summary judgment affirming the SRO's Decision. For the reasons discussed below, Plaintiff's motion for summary judgment is denied, and Defendant's cross-motion for summary judgment is granted.

## THE STATUTORY SCHEME

        "Congress enacted the IDEA to promote the education of students with disabilities." *M.P.G. ex rel. J.P. v. N.Y.C. Dep't of Educ.*, No. 08 Civ. 8051 (TPG), 2010 WL 3398256, at *1

---

[1]     A.M. was classified as having "mental retardation." All parties agree that the condition previously known as "mental retardation" is now described as an "intellectual disability." (Pl.'s Mem. 9; Def.'s Mem. 19).

(S.D.N.Y. Aug. 27, 2010).  The statute requires any state receiving federal funds to provide disabled children with a FAPE.  *See, e.g.*, *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, — F.3d —, No. 12-2720-CV, 2013 WL 3868594, at *1 (2d Cir. July 29, 2013).  To that end, school districts are required to "create an individualized education program ('IEP') for each such child" with a disability.  *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (citing 20 U.S.C. § 1414(d); *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)), *cert. denied*, 133 S. Ct. 2802 (2013).  An IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *R.E.*, 694 F.3d at 175 (internal quotation marks omitted).  An IEP must be "reasonably calculated to give educational benefits to the child."  *M.W.*, 2013 WL 3868594, at *1 (citing *R.E.*, 694 F.3d at 175).

In New York, Committees on Special Education ("CSEs") — composed of the student's parent or parents, a regular and special education teacher of the student, a school board representative, a parent representative, and others appointed by the local school district's board of education — are responsible for developing IEPs.  *See* N.Y. Educ. Law § 4402(1)(b)(1)(a); *see also Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998).  "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program."  *R.E.*, 694 F.3d at 175.  To satisfy the IDEA, a school district must provide "an IEP that is 'likely to produce progress, not regression,'" and that offers "opportunity greater than mere 'trivial advancement.'"  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130).

2

Although the IDEA outlines both procedural and substantive requirements for IEPs, *see* 20 U.S.C. § 1414, it "does not itself articulate any specific level of educational benefits that must be provided through an IEP," *Walczak*, 142 F.3d at 130.  If a parent believes that his or her child's IEP is not compliant with the IDEA, the parent may file a due process complaint.  *See M.W.*, 2013 WL 3868594, at *1 (citing 20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. L. § 4404(1)); *R.E.*, 694 F.3d at 175 (citing 20 U.S.C. § 1415(b)(6)).  If a parent files a due process complaint, the school district has thirty days to remedy any deficiencies identified in the complaint without penalty.  *See R.E.*, 694 F.3d at 187-88 (citing 20 U.S.C. § 1415(f)(1)(B)).  If, at the end of this thirty-day "resolution period," the parent feels his or her concerns have not been adequately addressed, the parent can continue with the due process claim.  *See id.*  The IDEA then "mandates that states provide 'impartial due process hearings' before impartial hearing officers ('IHOs')."  *Id.* at 175 (quoting 20 U.S.C. § 1415(f)).  If dissatisfied with the IHO's ruling, either party may appeal the case to a state review officer ("SRO").  *Id.* (citing N.Y. Educ. Law § 4404(2)).  After exhausting administrative remedies through this process, either party may bring a civil action in state or federal court to review the SRO's decision.  *See id.* (citing 20 U.S.C. § 1415(i)(2)(A)).

## BACKGROUND

At the beginning of the 2010-2011 school year, A.M. was a fourteen-year-old girl, classified by the DOE as a student with an intellectual disability. (R. Ex. 1).[2]  A.M. had also been diagnosed with a number of learning and other disabilities — namely, expressive language disorder; auditory processing disorder; and fine motor, gross motor, and graphomotor deficits.

---

[2]     "R. Ex." refers to an exhibit submitted by one of the parties during the impartial hearing; the DOE's exhibits are numbered, while Y.N.'s exhibits are lettered.  "Tr." refers to the transcript of the impartial hearing.

(R. Ex. 4).  A.M. attended public schools through the fourth grade.  (Tr. 615).  For fifth and sixth grade, she attended Cooke Center Academy ("Cooke" or "Cooke Center"), before returning to public school for seventh grade.  (Tr. 615-16).  By the end of that year, it was apparent that the public school placement was inappropriate for A.M., and Y.N. elected to return A.M. to Cooke for the 2009-2010 school year.  (Tr. 553, 617).

In the summer of 2008, A.M. was evaluated using developmental and skills tests by Dr. Cecelia McCarton.  (R. Ex. 4).  A.M.'s test scores mostly placed her in the lowest decile of her peers, although on a written language subtest she ranked in the thirteenth percentile, and on a test of her visual perception skills she ranked in the thirty-second percentile.  (*Id.* at 4-7 to 4-8).  Dr. McCarton recommended that A.M. be placed "in a small classroom for students with language learning disabilities, but not behavior problems" and that she "receive social skills training with girls in her own age group."  (R. Ex. 4 at 4-5).  Dr. McCarton also recommended that A.M. be provided with "some one-to-one instruction in mathematical computation as well as applied math" and that A.M. be placed in a twelve-month educational program.  (*Id.* at 4-5 to 4-6).

In or about November 2009, A.M.'s teachers at Cooke produced a "Skills-Based Progress Report" laying out A.M.'s "instructional grade levels" in various subjects as of the start of September 2009, the beginning of the academic year.  (R. Ex. 3; Tr. 569-70).  According to the Progress Report, A.M.'s levels in reading and listening comprehension, writing, and certain mathematical functions ranged from a first-grade level to a third-grade level.  (R. Ex. 3).

On January 4, 2013, a CSE convened to consider A.M.'s IEP for the 2010-2011 school year.  (R. Ex. 1).  The participants in the meeting were Y.N. (A.M.'s mother), Gavin Schneider (as special education teacher and district representative), Ivy Marcus (as general education teacher), Anna Valentine (as school psychologist), Isadora DeVeaux (as parent member),

Amanda Tarpey (as A.M.'s classroom teacher at Cooke), Cindy Surdi (as educational services supervisor at Cooke), and Nadine Rothman (as director of Cooke's middle school).  (*Id.*).  After reviewing Dr. McCarton's 2008 psychoeducational evaluation, the November 2009 progress report from Cooke, and a medical report (which the DOE did not enter into the record), and discussing these materials with Y.N., the CSE recommended a twelve-month Extended School Year ("ESY") program rather than the standard ten-month academic calendar.  (R. Exs. 1-2).  In addition, the CSE recommended that A.M. be educated in a 12:1:1 special class (meaning twelve students with one professional and one paraprofessional) in a specialized school, with related counseling, occupational therapy, and speech/language therapy services.  (R. Ex. 1).  Y.N. visited P721M, the school that the DOE proposed for A.M., in July 2010.  (Tr. 622-24).  The school maintained several sites, and at the time of the visit, P721M not yet determined which site A.M. would attend.  (*Id.* at 629, 647).  Y.N. ultimately rejected the proposed placement for A.M. and re-enrolled her daughter at Cooke for the 2010-2011 school year.  (R. Ex. A).

On March 24, 2011, Y.N. filed a due process complaint seeking tuition reimbursement based on the DOE's alleged denial of a FAPE to A.M.  (R. Ex. 6).  An IHO held a hearing over five dates from June 24, 2011 through October 24, 2011.  (IHO Decision 3).  On December 6, 2011, the IHO issued a decision rejecting all of the claims raised in Y.N.'s due process complaint.  Nevertheless, the IHO found that the DOE had "opened the door" to consideration of the appropriateness of an ESY program by raising that issue during the hearing.  (*Id.* at 12).  On that issue, the IHO concluded that the requirement that the DOE educate A.M. in the Least Restrictive Environment ("LRE") applied to the decision to recommend an ESY program, and that because the ESY program recommended by the CSE was not the least restrictive environment appropriate for A.M., that recommendation constituted the denial of a FAPE .  (*Id.*

at 12-13).  The IHO also found that Y.N.'s choice of Cooke was appropriate and awarded tuition

reimbursement on that basis.  (*Id.* at 13).  The IHO reduced the tuition award by $6,500,

however, because she found that Y.N. provided late notice to the DOE of her rejection of the IEP

placement.  (*Id.*).

Following the IHO's decision, both parties appealed to the Office of State Review, with

Y.N. seeking reversal of the reduction of the tuition award and the DOE seeking dismissal of

Y.N.'s claim.  (SRO Decision 1).  On April 23, 2012, the SRO reversed the IHO's finding that

the DOE had raised the ESY program issue in its case-in-chief and, in the alternative, found that

the LRE requirement did not apply to the decision to recommend an ESY program.  (*Id.* at 7-10).

The SRO affirmed the IHO's denial of Y.N.'s other claimed grounds for the denial of a

FAPE,and found that the DOE had in fact offered a FAPE to A.M.  (*Id.* at 10-20).  Accordingly,

the SRO reversed the tuition award to Y.N.  (SRO Decision 20).[3]  On July 19, 2012, Y.N. sought

review of the SRO's decision in this Court, challenging his reversal of the IHO and denial of the

other claimed grounds for relief.  (Docket No. 1).

## DISCUSSION

### A.  Standard of Review

Summary judgment motions in the context of the IDEA involve "more than looking into

disputed issues of fact."  *T.P. ex rel S.P.  v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247,

252 (2d Cir. 2009) (per curiam).  Instead, they are a "pragmatic procedural mechanism for

reviewing administrative decisions."  *M.W.*, 2013 WL 3868594, at *4 (internal quotation marks

omitted).  The Court in such cases conducts an "'independent' judicial review."  *Walczak*, 142

---

[3]      The copies of the IHO and SRO Decisions submitted by Defendant as part of the
administrative record in this case were initially incomplete.  At the Court's request, Defendant
provided complete courtesy copies of the decisions.  It does not appear, however, that updated
copies of the Decisions were formally filed with the Court.  No later than August 23, 2013,
Defendant shall file complete versions of the IHO and SRO decisions under seal.

F.3d at 129 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205 (1982)).  The Supreme Court has

explained, however, that conducting an independent judicial review is not an "'invitation . . . to

substitute'" the Court's "'own notions of sound educational policy for those of the school

authorities they review.'"  *Id.* (quoting *Rowley*, 458 U.S. at 206).  The "district court must base

its decision on the preponderance of the evidence," but it must also "give due weight to the

administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge

and experience necessary to resolve persistent and difficult questions of educational policy."

*A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks and

brackets omitted).

      The Second Circuit recently synthesized its caselaw on the degree of deference owed

under the "due weight" standard, "conclud[ing] that the deference owed to an SRO's decision

depends on the quality of that opinion."  *R.E.*, 694 F.3d at 189.  That is, the Court of Appeals

rejected familiar bright-line standards such as clear error and *de novo* review.  It held instead that

a district court's deference to an administrative officer's decision "will hinge on the kinds of

considerations that normally determine whether any particular judgment is persuasive, for

example whether the decision being reviewed is well-reasoned, and whether it was based on

substantially greater familiarity with the evidence and the witnesses than the reviewing court."

*M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012).  Recognizing the imprecision

of this standard, the Circuit further explained:

> By way of illustration, determinations regarding the substantive adequacy of an
> IEP should be afforded more weight than determinations concerning whether the
> IEP was developed according to the proper procedures.  Decisions involving a
> dispute over an appropriate educational methodology should be afforded more
> deference than determinations concerning whether there have been objective
> indications of progress.  Determinations grounded in thorough and logical
> reasoning should be provided more deference than decisions that are not.  And the
> district court should afford more deference when its review is based entirely on

the same evidence as that before the SRO than when the district court has before
it additional evidence that was not considered by the state agency.

*Id.* (citations omitted).

In this context, "[c]ourts generally defer to the final decision of the state authorities, even
where the reviewing authority disagrees with the hearing officer." *Id.* at 241 (internal quotation
makes omitted).    That is, reviewing courts are generally "not entitled to adopt the conclusions
of either state reviewer according to their own policy preferences or views of the evidence," but
"must defer to the reasoned conclusions of the SRO as the final state administrative
determination." *Id.* at 246.  That deference is not absolute, however, and where a reviewing
court "concludes that the SRO's determinations are insufficiently reasoned to merit that
deference, and in particular where the SRO rejects a more thorough and carefully considered
decision of an IHO, it is entirely appropriate for the court . . . to consider the IHO's analysis,
which is also informed by greater educational expertise than that of judges, rather than to rely
exclusively on its own less informed educational judgment." *Id.*  Moreover, courts may not
"simply rubber stamp administrative decisions," *R.E.*, 694 F.3d at 184 (internal quotation marks
omitted), and may consider additional evidence not presented in the proceedings below, *see* 20
U.S.C. § 1415(i)(2)(C).

"When a state's decision under the IDEA is challenged in federal court, [the] court
conducts a review of both the procedural and substantive adequacy of the underlying decision."
*B.O. v. Cold Spring Harbor Cent. Sch. Dist.*, 807 F. Supp. 2d 130, 134 (E.D.N.Y. 2011).  First,
"courts examine whether . . . the state has complied with the procedures set forth in the IDEA."
*R.E.*, 694 F.3d at 190 (internal quotation marks omitted).  Second, courts "examine whether the
IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child

to receive educational benefits." *Id.* (internal quotation marks and brackets omitted).  While

substantive inadequacy automatically entitles parents to reimbursement, procedural violations do

so only "if they 'impeded the child's right to a [FAPE],' 'significantly impeded the parents'

opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational

benefits.'"  *Id.* (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)) (alteration in original).  Procedural

violations must be considered cumulatively.  *See M.W.*, 2013 WL 3868594, at *5 (citing *R.E.*,

694 F.3d at 190)).

## B.  Analysis

Plaintiff appeals on a number of procedural and substantive grounds.  In particular, she

argues that: (1) the CSE was improperly composed; (2) the CSE had pre-determined A.M.'s IEP

prior to its meeting; (3) the CSE did not have adequate information to develop A.M.'s IEP; (4)

the ESY recommendation was unduly restrictive; (5) the IEP reflects inaccurate academic levels

for A.M; (6) the goals in the IEP were insufficiently specific or unreasonably ambitious; and (7)

the DOE's proposed placement represented an improper functional grouping for A.M. and was

an unsafe learning environment.  The Court will address these arguments in turn.

### 1.  Composition of the CSE

A.M. argues first that the CSE was improperly composed because Schneider was not

qualified to serve as the special education teacher representative.  (*See* Pl.'s Mem. 6).  A.M.

contends that this violation caused a deprivation of educational benefits and, as a result, impeded

her right to a FAPE, because Schneider's "testimony clearly indicates that his input was based

upon inaccurate and prejudicial assumptions about A.M. on the basis of her classification as

mentally retarded."  (*Id.* at 6).  The SRO rejected this argument, concluding that even if the lack

of "a special education teacher who could have personally implemented the student's IEP had the

student attended the district's proposed program" constituted a procedural violation, it did not

"impede[ ] the student's right to a FAPE, significantly impede[ ] the parent's opportunity to

participate in the decision-making process, or cause[ ] a deprivation of educational benefits."

(SRO Decision 10).  Among other things, the SRO noted that A.M.'s mother participated

extensively in the CSE and voiced her concerns, that A.M.'s "head classroom teacher and two

supervisors" from Cooke also participated in the CSE, and that "the district's special education

teacher previously taught special education."  (*Id.* at 10-11).

The Court agrees that Plaintiff has established a procedural violation of the IDEA.  As

relevant here, the statute and regulations require that the special education teacher participating

on the CSE be the special education teacher "of the child," 34 C.F.R. § 300.321(a)(3); *see also*

20 U.S.C. § 1414(d)(1)(B)(iii); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(c)(2)(iii), and that

the teacher must be "certified or licensed to teach students with disabilities," N.Y. Comp. Codes

R. & Regs. tit. 8, § 200.1.[4]  Thus, the relevant question, unanswered by the SRO, would seem to

be whether A.M.'s special education teacher participated, not whether Schneider himself was

qualified.  The answer to that question is unclear.  Tarpey, A.M.'s teacher at Cooke, was part of

the CSE, but she was identified as the head classroom teacher, not A.M.'s special education

---

[4]      Plaintiff argues that the regulations "require that a CSE's special education teacher either
be the person charged with implementing the IEP, or at the very least, someone qualified to do
so."  (Pl.'s Mem. 6).  The requirement that the special education teacher be "a teacher qualified
to provide special education in the type of program in which the student may be placed,"
however, applies only where the student is being recommended for special education for the first
time, *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1, which was not the case for A.M (Pl.'s
Opp'n 19; R. Ex. 1 at 1-2 (noting that the "Referral Type" was "Annual Review" rather than
"Initial" and that the "Conference Result" was to "Change Recommended Service" rather than
"Initiate Service")).  To the extent that Plaintiff argues that Schneider does not qualify as the
district representative because he does not meet the general requirement that the representative
be "qualified to provide, or supervise the provision of, specially designed instruction to meet the
unique needs of children with disabilities," 20 U.S.C. § 1414(d)(1)(B)(iv), the argument is
without merit, as Schneider has extensive special education experience as a teacher, as a mentor
to other teachers, and as a supervisor and district representative for his CSE region.  (Tr. 9-16).

10

teacher (who may be someone else entirely).  Moreover, Schneider, rather than Tarpey, was specifically identified as the special education teacher representative on the CSE.  (R. Ex. 1 at 1-2).  Thus, while Tarpey's presence on the CSE might satisfy the regulations, the Court cannot be certain of that on the present record and therefore finds that Plaintiff has identified a technical violation of the procedural requirements for the composition of the CSE.

That does not end the inquiry, however, as procedural violations constitute denial of a FAPE only "if they 'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'"  *R.E.*, 694 F.3d at 190.  The SRO's conclusions on that score, although premised upon a slightly different assumed violation, apply with equal force here.  The participation of three Cooke Center personnel, as well as A.M.'s mother, enabled the CSE to obtain student-specific information, and the participation of Schneider provided expertise in the district's special education offerings.  A.M.'s argument that Y.N. was "unable to influence the actual recommendation" (Pl.'s Mem. 7), is misguided, as all that is required is a parent's participation, not that the parent have the final word.   The fact that the IEP itself does not record her objections is also irrelevant, as the testimony makes clear that she voiced her concerns and that they were considered by the CSE.  (Tr. 66-67, 565, 567).  Accordingly, although the Court finds that the composition of the CSE was a technical procedural violation, it did not impede A.M.'s right to a FAPE, significantly impede Y.N.'s opportunity to participate in the decisionmaking process, or cause a deprivation of educational benefits.

### 2.  Pre-Determination of A.M.'s Program

Next, A.M. challenges the IEP on the ground that the CSE had improperly predetermined A.M.'s program before the meeting.  (Pl.'s Mem. 7).  The sole basis for this challenge is

Schneider's testimony that the CSE meeting was scheduled in January because "one of the policies, also, behind the CSE is, we do 12 months, if it is a 12-month program. It goes year- —— again, it goes year-round.  We do the year-round programs somewhere around January or February."  (Tr. 55).  Plaintiff asserts that Schneider "was not talking about students who are being *considered* for placement in 12-month programs; the full context of his statement plainly reveals that the CSE had already reached its decision before the IEP meeting."  (Pl.'s Mem. 7). That conclusion is not supported by Schneider's disjointed response or by the testimony of the other CSE participants, who made clear that the CSE took into account Y.N.'s and others' comments and concerns before making its recommendation.  (*See, e.g.*, Tr. 565, 567). Accordingly, there is no basis to the claim that the CSE improperly prejudged A.M.'s program.

### 3. Information Available to the CSE

A.M. claims also that the CSE had inadequate information to properly develop her IEP. Under the relevant statute and regulations, the DOE must conduct a reevaluation of the student every three years, *see* 34 C.F.R. § 300.303(a)(2); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(4), must "[u]se technically sound instruments that may assess the relative contribution of cognitive and behavioral factors," 34 C.F.R. § 300.304(b)(3), and must "ensure that . . . . [t]he child is assessed in all areas related to the suspected disability, including, . . . general intelligence [and] academic performance," *id.* § 300.304(c)(4).  Plaintiff contends that the materials available to the CSE — Dr. McCarton's psychoeducational evaluation, the Cooke progress report, and a medical history — failed to satisfy these requirements because they did not include cognitive testing, evaluate her intellectual ability, or provide a basis for diagnosing her with an intellectual disability.  (Pl.'s Mem. 7-13).  Plaintiff concedes, however, that the information available to the CSE was timely pursuant to the relevant regulation (*id.* at 8; Pl.'s Opp'n 19), and she does not

ultimately dispute that A.M. is in fact intellectually disabled.

The SRO ruled that the CSE was not obligated to obtain additional information, concluding that "the hearing record supports a finding that the CSE had and reviewed appropriate evaluative information that enabled it to gather the relevant functional, developmental, and academic information about the student."  (SRO Decision 12).  Although Plaintiff contests the SRO's findings as cursory and insufficient, that is an unfair characterization.  The SRO devoted considerable space to detailing and summarizing the information available to the CSE as it developed A.M.'s IEP, but his analysis did not stop there and amounts to much more than merely "paraphras[ing]" the record.  (Pl.'s Opp'n 17).  In fact, the SRO drew specific conclusions about the sufficiency of the available information, supported by citations to the record.  For example, after reviewing the 2008 evaluation, the SRO noted that it "included a summary of test findings pertaining to academic skills, fine motor and graphomotor skills, and adaptive behavior skills," as well as "a summary of the neurodevelopment and psychological evaluations with diagnosis and recommendations."  (SRO Decision 12 (citing R. Ex. 4 at 4-3 to 4-5)).

Moreover, despite Plaintiff's assertion that the evaluation was insufficient to determine whether a twelve-month program was appropriate (Pl.'s Mem. 10), the SRO also noted that the 2008 report included a recommendation for a twelve-month program (SRO Decision 12).  Finally, the SRO carefully reviewed the IEP to ensure that it was consistent with the information in the 2008 and 2009 reports on A.M.'s abilities and achievement levels.  (*Id.* at 14-15).  He noted that for several categories of academics and other skills, the IEP was "consistent with" and in some cases "reflected almost word for word . . . the November 2009 progress report from Cooke."  (*Id.* at 14-15).  His analysis of the available information, and the degree to which the

13

IEP reflected that information, formed a strong basis for his conclusion that "the January 2010 CSE had sufficient information relative to the student's present levels of academic achievement and functional performance at the time of the CSE meeting to develop an IEP that accurately reflected the student's special education needs." (SRO Decision 14).

Accordingly, the SRO's decision was thorough and well reasoned, and his conclusions are therefore entitled to significant deference. In any event, after conducting an independent review, the Court agrees with the SRO's conclusions. The 2008 report itself is clear that it measured A.M.'s "*cognitive*, language, visual/perceptual, and behavioral skills." (R. Ex. 4 at 4-2 (emphasis added)). Plaintiff's assertion that it was limited to A.M.'s academic skills is without basis, as the Report included detailed sections addressing her fine, gross, and graphomotor skills; communication; socialization; attention and activity; and adaptive behavior skills in sections separate and apart from the section labeled "Academic Skills." (R. Ex. 4 at 4-2 to 4-4). Accordingly, the Court finds that the CSE did not require additional information to develop A.M.'s IEP, and that the development of the IEP based upon the materials available did not constitute a denial of a FAPE.

### 4. The ESY Recommendation

Plaintiff's next challenge concerns the CSE's recommendation that A.M. be placed in a twelve-month ESY program — the one issue on which the IHO and the SRO disagreed. (*Compare* IHO Decision 12-13, *with* SRO Decision 8-9). Significantly, A.M. concedes that she failed to include a challenge to the appropriateness of this recommendation in her due process complaint. (Pl.'s Opp'n 7). Normally, that failure would preclude consideration of the claim by the IHO and SRO, not to mention by a court reviewing their decisions. *See, e.g.*, *B.M. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 3247 (JMF), 2013 WL 1972144, at *5-6 (S.D.N.Y. May 14, 2013)

(holding that a district court lacks subject-matter jurisdiction to review claims not raised in the due process complaint).  Nevertheless, in this case, the IHO found that the DOE had raised the issue in the direct testimony of its first witness, which "opened the door for consideration" of the issue.  (IHO Decision 12).  The IHO further found that the LRE requirement applied to the recommendation for an ESY program for A.M. and that it was "inappropriate for the DOE to have recommended a more restrictive environment in a 12-month program for a child whose progress in a 10-month program was significant and well documented."  (*Id.*).  On this basis, the IHO found that A.M.'s IEP constituted the denial of a FAPE.  (*Id.* at 13).

The SRO reversed the IHO, finding first that "while the hearing record contains some testimony relating to the district's recommendation that the student attend a 12-month program, . . . the district did not 'open the door' by agreeing to expand the scope of the impartial hearing." (SRO Decision 8).  As a result, the SRO ruled that "the IHO should have confined her determination to the issues raised in the parent's amended due process complaint notice and erred in considering whether the district's recommendation of a 12-month program constituted a denial of a FAPE."  (*Id.* at 8-9).  In the alternative, the SRO concluded in a footnote that the IHO had erred on the merits, as the ESY and LRE analyses are distinct— that is, the consideration of whether an ESY is warranted is not a component of, or even related to, the question of whether the recommended environment is "restrictive" (as that term is used in this context), let alone whether it is the "least restrictive."  (*Id.* at 9 n.5).  Accordingly, the SRO found that A.M. had not been denied a FAPE on this basis.  (*Id.* at 9).

This Court agrees with the SRO that Plaintiff's failure to include the ESY claim in her due process complaint is a bar to review and therefore does not reach the merits of this claim. The IDEA provides that the party requesting a due process hearing "shall not be allowed to raise

issues at the due process hearing that were not raised in the notice . . . unless the other party agrees otherwise."  20 U.S.C. § 1415(f)(3)(B).  As the Second Circuit has explained, this requirement is critical to ensure that the "resolution period" in which a school district is permitted to resolve complaints without penalty functions as intended.  *See R.E.*, 694 F.3d at 187-88 & n.4.  After all, in the absence of the requirement, a parent could "sandbag the school district" and "take advantage of a school district . . . that inadvertently or in good faith omits a required service from the IEP."  *Id.* at 188 & n.4.  By statute, "[a]ny party aggrieved by the findings and decision made" in a due process hearing has "the right to bring a civil action *with respect to the* [*due process*] *complaint presented*."  20 U.S.C. § 1415(i)(2)(A) (emphasis added).

Failure to exhaust the remedies provided in this review process, the Second Circuit has long held, deprives a federal court of subject-matter jurisdiction to consider the claim on appeal from the SRO.  *See, e.g.*, *Cave v. East Meadow Union Free Sch. Dist.*, 514 F .3d 240, 243 (2d Cir. 2008); *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002); *Hope v. Cortines*, 69 F.3d 687, 688 (2d Cir. 1995).  A district court, therefore, may only review issues raised in a plaintiff's due process complaint.  *See, e.g.*, *B.P. v. New York City Dep't of Educ.*, 841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO and this Court, is limited to matters either raised in the Plaintiffs' impartial hearing request or agreed to by Defendant."); *M.R. v. S. Orangetown Cent. Sch. Dist.*, No. 10 Civ. 1800 (CS), 2011 WL 6307563, at *13 (S.D.N.Y. Dec. 16, 2011) ("[T]here is a statutory bar to the IHO considering issues not raised in the demand for a due process hearing, absent the district's or IHO's consent to a timely amendment.  Accordingly, this Court is constrained to conclude that Plaintiffs' request for [relief not requested in the due process complaint] is improper for failure to exhaust administrative remedies."  (citations omitted)).

Relying on the Second Circuit's decision in *M.H.   v. N.Y.C. Department of Education*, 685 F.3d 217, 244 (2d Cir. 2012), Plaintiff tries to avoid the effect of her failure to raise the ESY issue in her due process complaint by arguing that the DOE "opened the door" to it during the hearing.  (Pl.'s Opp'n 7-8).  But this case is a far cry from *M.H.*, where the DOE raised the disputed issue, "first in its opening statement, and then in the questioning of its first witness," and where "much of the testimony presented by both parties to the IHO related to the [issue]." *M.H.*, 685 F.3d at 250.  In those circumstances, the Second Circuit rightly held that it would be "unfair" to allow the DOE to make an argument, "but then to bar the parents" from rebutting it. *Id.*  In this case, however, Plaintiff can point to only passing mention of the "twelve-month program" during the hearing — principally, Schneider's answer to a single question from DOE counsel in which he testified about the appropriateness of the ESY recommendation. (Pl.'s Opp'n. 7 (citing Tr. 41)).  Additionally, there is no indication that the DOE sought, let alone obtained, a strategic advantage by raising it.    In fact, immediately after Schneider's answer, DOE counsel refined the question to focus solely on the program itself rather than on its length. (Tr. 41-42).  And when Plaintiff's counsel inquired about the appropriateness of the ESY placement, DOE counsel repeatedly objected on the ground that the issue was beyond the scope of the due process complaint.  (Tr. 107, 620-21, 705, 730-31).  *Cf. M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 151 (S.D.N.Y. 2010) (noting the DOE's failure to object until re-cross in concluding that the DOE had opened the door to review of the disputed issue).

In these circumstances — that is, given the isolated references to the appropriateness of the ESY recommendation in a lengthy hearing and the lack of any indication that the DOE raised the issue to obtain a strategic advantage — it would not be "unfair" to bar Plaintiff from litigating the issue.  In fact, it would be unfair to the school district, and do violence to the

statutory exhaustion requirement, to hold otherwise.  Accordingly, the Court concludes, as the

SRO did, that the DOE did not open the door to review of the ESY recommendation, and

therefore that the Court lacks subject-matter jurisdiction to review the issue on the merits.

### 5.  A.M.'s Reported Academic Levels

Plaintiff next alleges that there was a "clear-cut denial of [a] FAPE" because "[n]o

teacher could possibly derive an accurate picture of A.M.'s [academic] levels" from the reporting

included in the IEP.  (Pl.'s Mem. 16).  In particular, Plaintiff takes issue with the fact that the IEP

includes two measures, a "Grade Estimate" and an "Instructional Level," a distinction that she

questions.  (*Id.*).  Schneider's testimony at the hearing and the SRO's decision make clear,

however, that the Grade Estimate is "where the school is reporting the child is functioning" —

that is, the child's level as reported by the teacher at the time of the CSE — while the

Instructional Level is the "level at which the district would like the child to be instructed, based

upon considerations such as the New York State alternate assessment."  (Tr. 116-18; SRO

Decision 15).  On this basis, the SRO found that the IEP accurately reflected A.M's academic

levels.  (SRO Decision 15).  Affording that decision the required level of deference, and finding

that the IEP accurately reflected the grade levels reported by A.M.'s teachers, the Court agrees

that the IEP did not deny A.M. a FAPE based on incorrectly reported academic levels.

### 6.  The IEP Goals

A.M. also contests the IEP's goals for the 2010-2011 academic year.  (*See* Pl.'s Mem. 17-

19).  An IEP must include "a statement of measurable annual goals, including academic and

functional goals, designed to . . . meet the child's needs that result from the child's disability to

enable the child to be involved in and make progress in the general education curriculum[,] and

. . . meet each of the child's other educational needs that result from the child's disability."  20

U.S.C. § 1414(d)(1)(A)(i)(II); *see also* 34 C.F.R. § 300.320[a][2][i]; N.Y. Comp. Codes R. & Regs. tit. 8,§ 200.4(d)(2)(iii).  The IHO found that the IEP fell short of this standard in one minor respect — because it included a short-term objective that A.M. had already accomplished — but nevertheless concluded that it was valid.  (IHO Decision 11).  After conducting his own review, the SRO agreed.  (SRO Decision 16 n.8).  These conclusions carry substantial weight, as "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers."  *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003).  Plaintiff's efforts to contest them fall short.

As an initial matter, two of Plaintiff's contentions are belied by the record.  First, although Plaintiff complains that the editing goal is too vague (Pl.'s Mem. 17), it explicitly provides that A.M. "will do [the editing goal] on 4 out of 5 occasions, in 3 out of 4 trials," and that she "will be evaluated by the provider, every four weeks, with 80% accuracy, reviewed every marking period."  (R. Ex. 1 at 1-17).  Second, the social goals that Plaintiff claims are restricted to counseling rather than the classroom are to be "assessed by [a] *teacher*/counselor in 4 out of 5 *classroom* situations/counseling sessions."  (R. Ex. 1 at 1-18 (emphasis added)).  Plaintiff's third contention — that the IEP omitted a goal from the 2009 progress report — is an insufficient reason to reject the IEP altogether.  Ironically, Plaintiff complains elsewhere that the IEP too closely tracks the progress report.  (Pl.'s Opp'n 17-18).  And, in any event, there is no requirement that the IEP contain all of the goals from a student's earlier progress report.

Plaintiff also contends that several of the IEP's goals are inappropriately ambitious, as they call for A.M. to make two years of progress from her then-reported grade estimates.  (Pl.'s Mem. 17).  Plaintiff, however, offers no support for the proposition that a two-year goal is categorically inappropriate or constitutes the denial of a FAPE.  Moreover, a two-year goal is not

19

unreasonable here, as the grade estimates were developed early in the 2009-2010 school year, and the IEP was designed to serve as a guide for A.M.'s education through the end of the 2010-2011 academic year — that is, almost two years after the benchmark grade estimates.  Whether it is realistic for A.M. to attain that achievement in light of her disability is a question of educational policy and expertise that the Court will not second guess.

As noted, Plaintiff further objects to the IEP because many of the goals were drawn from the November 2009 progress report completed by A.M.'s teachers at Cooke.  (Pl.'s Opp'n 17-18).  She thus characterizes these goals as "redundant" because if she were to achieve her 2009-2010 goals, there would be no benefit to the IEP for the 2010-2011 academic year.  (*Id.* at 18).  This argument fails, however, as the IEP would be repetitive or redundant only if it repeated goals from A.M.'s prior IEP, not a progress report prepared by her teachers.  Plaintiff cites no authority for the proposition that drawing goals from a teacher's progress report is a violation of the statute or regulations, and A.M. has specifically denied that her objection is that the goals repeat those from a prior IEP.  (Pl.'s Opp'n 19).

In two respects, Plaintiff's complaints about the IEP's goals are valid, but they do not rise to a level that warrants relief.  First, the IEP included as a short-term objective that A.M. will write "a complete sentence" (R. Ex. 1 at 1-16), even though it explained elsewhere that A.M. could already "generate two to three sentences that are on topic and effectively answer [a] question" (*id.* at 1-3).  In other words, the IEP included a short-term objective that A.M. had already accomplished.  As the IHO and SRO found, however, this flaw in the IEP was not sufficiently serious to invalidate the entire IEP given its other extensive goals and objectives.  (IHO Decision 11; SRO Decision 16 & n.8).  Second, two of A.M.'s math goals do not contain specific standards against which A.M. would be measured.  (R. Ex. 1 at 1-10).  "Courts have

been reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress," however, in light of the significant deference afforded to the administrative officers' findings on the sufficiency of the goals.  *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 109 (E.D.N.Y. 2011); *see also J.L. v. City Sch. Dist. of City of N.Y.*, No. 12 Civ. 1516 (CM), 2013 WL 625064, at *13 (S.D.N.Y. Feb. 20, 2013).  Here, deference is especially appropriate, as both the IHO and SRO concluded that the goals were sufficient and measurable.  (IHO Decision 11; SRO Decision 15-16).

Moreover, although the two math goals lack the same type of measurement standard contained in other annual goals in the IEP (such as performing tasks three out of four times with eighty percent accuracy), both include the types of specific tasks that A.M. must perform to demonstrate progress towards her goals.  Specifically, each goal includes four tasks for A.M. to perform, such as highlighting operational signs before beginning problems or writing out the equations necessary to solve a word problem.  (R. Ex. 1 at 1-10).  Where an IEP's goals are "deficient because they did not indicate a target achievement level against which progress could be measured," an SRO and district court may still find them to be "measurable" if the IEP "include[d] a description of how the student's progress toward meeting the annual goals will be measured during the year the IEP is in effect."  *R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist.*, 615 F. Supp. 2d 283, 295 (S.D.N.Y. 2009) (internal quotation marks omitted) (finding no error where the SRO found goals to be "measurable" notwithstanding the IHO's finding that they lacked a "target achievement level"), *aff'd* 366 F. App'x 239 (2d Cir. 2010).  Here, because the IEP includes the specific tasks on which A.M. will be measured, the failure to include a specific measurement standard is not sufficiently serious to constitute the denial of a FAPE.

Accordingly, granting the appropriate deference to the IHO and SRO, the Court rejects Plaintiff's arguments and finds that the IEP's goals were appropriate.

### 7. Functional Grouping and Safety at Placement

A.M.'s final challenges are that she was improperly grouped at her placement and that the placement was not a safe learning environment because it shared a building with several other schools and there were fights between students at the placement school and the other schools. (Pl.'s Mem. 19-22).

As to the former, state regulations require that students in special education classes must be "grouped together according to similarity of individual needs," such that "[t]he curriculum and instruction provided to such groups shall be consistent with the individual needs of each student in the group, and the instruction required to meet the individual needs of any one student in the group shall not consistently detract from the instruction provided other students in the group."  N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(ww)(3)(ii).  The Second Circuit has been clear, however, that where a parent enrolls the child in a private placement before the time that the district would have been obligated to implement the IEP placement, the validity of proposed placement is to be judged on the face of the IEP, rather than from evidence introduced later concerning how the IEP might have been, or allegedly would have been, implemented.  *See R.E.*, 694 F.3d at 186-87; *Grim*, 346 F.3d 381-82.

As the IHO and SRO held, that is the case here because Y.N. rejected the proposed placement and enrolled A.M. in a private placement.  (IHO Decision 12; SRO Decision 17; R. Ex. A).  Yet Plaintiff fails to identify any flaws on the face of the IEP.  Instead, she bases her challenge on an assessment of what the functional grouping might have been had the placement been implemented.  As the IHO and SRO concluded, that is too "speculative" a basis to warrant

relief.  *See R.E.*, 694 F.3d at 195 ("Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement.").  The fact that the DOE failed to show Y.N. an appropriate class when she tried to visit the school does not affect that conclusion. Moreover, Plaintiff did not include a claim relating to that failure in her due process complaint (R. Ex. 6; IHO Decision 11-12; SRO Decision 9-10), so this Court may not review it on appeal. *See, e.g.*, *B.M.*, 2013 WL 1972144, at *5-6 (holding that a district court lacks subject-matter jurisdiction to review claims not raised in the due process complaint).

    As for the safety of the placement, the SRO found that the school provided a safe learning environment.  (SRO Decision 19-20).  The SRO's finding was based upon the testimony of Richard Shair, the special education teacher at the placement site, who testified that school deans and safety officers routinely patrolled the floors and cafeteria (Tr. 246, 290-91); that the students at the school are supervised on the buses, in the cafeteria, and during entrance to the school when they might interact with students from other schools in the same building (Tr. 247-48); and that it is immediately reported if students from other schools are found on the premises of the proposed placement school (Tr. 247).  In the face of this evidence, Plaintiff points to the testimony of Dr. Francis Tabone, the Assistant Head and school psychologist at the Cooke Center, who testified that he was aware of "a couple of instances" where there were "physical altercations," which he characterized as "pretty severe," between students from the proposed placement and students attending other schools in the same physical building (Tr. 387), and Y.N.'s own testimony that she had heard reports of fighting during her tour of the placement. (Tr. 653-54).  These vague and unsubstantiated secondhand reports, however, carry less weight than the testimony and opinions of an experienced teacher who works in the school every day. That is, Plaintiff's argument is unsupported by the hearing record.

## CONCLUSION

Having rejected all of Plaintiff's challenges, and because the IEP was "reasonably calculated to enable the child to receive educational benefits," *R.E.*, 694 F.3d at 175 (internal quotation marks omitted), the Court finds that A.M. was offered a FAPE.  Specifically, the IEP offered A.M. "an opportunity greater than mere trivial advancement."  *M.R.*, 2011 WL 6307563, at *5 (internal quotation marks and citations omitted).  To be sure, it may not have provided A.M. with "everything that might be thought desirable" by her loving mother.  *Id.*  But the IDEA does not guarantee such an outcome.  It demands only that the school district provide "an IEP that is 'likely to produce progress, not regression.'"  *Cerra*, 427 F.3d at 195 (quoting *Walczak*, 142 F.3d at 130).  Granting the necessary deference to the judgments of the IHO and the SRO, *see id.*, the Court concludes that A.M.'s did.[5]  Accordingly, Plaintiff's motion for summary judgment is denied, and Defendant's cross-motion for summary judgment is granted.

No later than August 23, 2013, Defendant shall file complete versions of the IHO and SRO decisions under seal.

The Clerk of the Court is directed to terminate the motions (Docket Nos. 8, 14) and to close the case.

SO ORDERED.

Dated:  August 9, 2013
        New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[5]  In light of the Court's conclusion that A.M. was not denied a FAPE, there is no need to address the appropriateness of Y.N.'s choice of Cooke as an alternative placement or the balance of equities.

24